1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10

| | | |
|---|---|---|
| 11 LINDA M. BIRKENSTEIN, | ) | Case No. SA CV 12-1525-SP |
| 12              Plaintiff, | ) | |
| 13        v. | ) | MEMORANDUM OPINION AND ORDER |
| 14 CAROLYN W. COLVIN, Acting | ) | |
| 15 Commissioner of Social Security Administration, | ) | |
| 16              Defendant. | ) | |
| 17 | ) | |

18

19                              **I.**

20                      **INTRODUCTION**

21          On September 12, 2012, plaintiff Linda M. Birkenstein filed a complaint

22 against defendant, the Commissioner of the Social Security Administration

23 ("Commissioner"), seeking a review of a denial of disability insurance benefits

24 ("DIB").  Both plaintiff and defendant have consented to proceed for all purposes

25 before the assigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The court

26 deems the matter suitable for adjudication without oral argument.

27

28                              1

Plaintiff presents three issues for decision: (1) whether the administrative law judge ("ALJ") properly considered the opinions of plaintiff's treating physicians, Rifat B. Rifat and James Gitlin; (2) whether the ALJ properly considered plaintiff's subjective complaints; and (3) whether the ALJ erred by failing to show that the alternate jobs cited require little to no vocational adjustment, despite plaintiff's advanced age. Memorandum in Support of Plaintiff's Complaint ("Pl.'s Mem.") at 12-21; Memorandum in Support of Defendant's Answer ("Def.'s Mem.") at 2-10.

Having carefully studied, inter alia, the parties' moving papers, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ improperly rejected the opinions of plaintiff's treating physicians, improperly discounted plaintiff's credibility, and failed to show that the alternate jobs cited require little to no vocational adjustment, despite plaintiff's advanced age. Therefore, the court remands this matter to the Commissioner in accordance with the principles and instructions enunciated in this Memorandum Opinion and Order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who was 60 years old on the date of her December 15, 2010 hearing, has three years of college education. AR at 26, 39, 138, 173. She has past relevant work experience as an emergency room nurse. *Id.* at 26, 41, 47.

On January 15, 2009, plaintiff filed an application for DIB, alleging an onset date of December 1, 2007, due to osteoporosis, degenerative disc disease, sciatica, high blood pressure, and chronic back and left leg pain. *Id.* at 22, 138, 142, 165. The Commissioner denied plaintiff's application, after which she filed a request for a hearing. *Id.* at 20, 54, 61.

2

1   On December 15, 2010, plaintiff, represented by counsel, appeared and

2  testified before the ALJ. *Id.* at 39-46, 51-52. Vocational expert ("VE") Alan

3  Boroskin also testified at the hearing. *Id.* at 46-51. On January 4, 2011, the ALJ

4  denied plaintiff's claim for benefits. *Id.* at 20-27.

5   Applying the well-known five-step sequential evaluation process, the ALJ

6  found, at step one, that plaintiff has not engaged in substantial gainful activity

7  since December 1, 2007, the alleged onset date. *Id.* at 22.

8   At step two, the ALJ found that plaintiff suffered from the following severe

9  impairments: degenerative joint disease bilaterally of the knees, lumbar disk

10  bulge, fibromyalgia, hypertension, and obesity. *Id.*

11   At step three, the ALJ found that plaintiff's impairments, whether

12  individually or in combination, did not meet or medically equal one of the listed

13  impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1 (the

14  "Listings"). *Id.* at 23.

15   The ALJ then assessed plaintiff's residual functional capacity ("RFC") [1] and

16  determined that she had the capacity to perform a range of light work as defined in

17  20 C.F.R. § 404.1567(b), consisting of: occasionally lifting and/or carrying twenty

18  pounds with frequent lifting and/or carrying ten pounds; standing and/or walking,

19  and sitting for a total of six hours (with normal breaks) in an eight-hour workday.

20  *Id.* The ALJ found plaintiff was limited to work involving occasional climbing of

21  ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, as well

22  _____

23   [1]   Residual functional capacity is what a claimant can do despite existing

24  exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152,

25  1155-56 nn.5-7 (9th Cir. 1989). "Between steps three and four of the five-step
   evaluation, the ALJ must proceed to an intermediate step in which the ALJ

26  assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486

27  F.3d 1149, 1151 n.2 (9th Cir. 2007).

28   3

1   as work involving even moderate exposure to machinery and heights.  *Id.*  The

2   ALJ also found plaintiff was restricted from work involving climbing of ladders,

3   ropes, or scaffolds.  *Id.*

4         The ALJ found, at step four, that plaintiff was unable to perform any past

5   relevant work as an emergency room nurse.  *Id.* at 26.

6          At step five, the ALJ found that, considering plaintiff's age, education,

7   work experience, and RFC, plaintiff has acquired work skills from past relevant

8   work that are transferable to other occupations, such as school nurse and office

9   nurse, with jobs existing in significant numbers in the national economy.  *Id.* at

10  26-27.  Consequently, the ALJ concluded that plaintiff was not under a disability

11  from December 1, 2007 through the date of his decision.  *Id.* at 27.

12        Plaintiff filed a timely request for review of the ALJ's decision, which was

13  denied by the Appeals Council.  *Id.* at 1-3.  The decision of the ALJ stands as the

14  final decision of the Commissioner.

15                                          **III.**

16                              **STANDARD OF REVIEW**

17        This court is empowered to review decisions by the Commissioner to deny

18  benefits.  42 U.S.C. § 405(g).  The findings and decision of the Commissioner

19  must be upheld if they are free of legal error and supported by substantial

20  evidence.  *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as

21  amended).  But if the court determines that the ALJ's findings are based on legal

22  error or are not supported by substantial evidence in the record, the court may

23  reject the findings and set aside the decision to deny benefits.  *Aukland v.*

24  *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d

25  1144, 1147 (9th Cir. 2001).

26

27

28                                          4

1    "Substantial evidence is more than a mere scintilla, but less than a

2    preponderance." *Aukland*, 257 F.3d at 1035.  Substantial evidence is such

3    "relevant evidence which a reasonable person might accept as adequate to support

4    a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276

5    F.3d at 459.  To determine whether substantial evidence supports the ALJ's

6    finding, the reviewing court must review the administrative record as a whole,

7    "weighing both the evidence that supports and the evidence that detracts from the

8    ALJ's conclusion." *Mayes*, 276 F.3d at 459.  The ALJ's decision "'cannot be

9    affirmed simply by isolating a specific quantum of supporting evidence.'"

10   *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th

11   Cir. 1998)).  If the evidence can reasonably support either affirming or reversing

12   the ALJ's decision, the reviewing court "'may not substitute its judgment for that

13   of the ALJ.'"  *Id.*  (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir.

14   1992)).

## IV.

## DISCUSSION

**A.**    **The ALJ Failed to Provide Specific and Legitimate Reasons for**
         **Rejecting the Opinions of Plaintiff's Treating Physicians**

19          Plaintiff argues that the ALJ erred in granting little or no weight to the

20   functional capacity assessments of treating physicians Rifat B. Rifat and James G.

21   Gitlin.  Pl.'s Mem. at 12.  Specifically, plaintiff contends that the ALJ erred in

22   discounting Dr. Rifat's opinion, without giving specific and legitimate medical

23   reasons, for having rendered "a broad conclusion" of disability that only the

24   Commissioner can ultimately determine (*id.* at 12-13), and in failing to accord

25   appropriate weight to evidence from Dr. Rifat, despite his status as a treating

26   source (*id.* at 13-14).  Also, plaintiff contends that the ALJ erred when he

27

28                                          5

1   concluded, without giving specific and legitimate reasons, that plaintiff's own

2   statements contradicted Dr. Gitlin's opinion and that Dr. Gitlin's functional

3   capacity assessment was not supported by the objective medical evidence. *Id.* at

4   14-15. The court agrees with plaintiff.

5        In determining whether a claimant has a medically determinable

6   impairment, among the evidence the ALJ considers is medical evidence. 20

7   C.F.R. § 416.927(b). In evaluating medical opinions, the regulations distinguish

8   among three types of physicians: (1) treating physicians; (2) examining

9   physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester*

10  *v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended). "Generally, a treating

11  physician's opinion carries more weight than an examining physician's, and an

12  examining physician's opinion carries more weight than a reviewing physician's."

13  *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R.

14  § 416.927(c)(1)-(2). The opinion of the treating physician is generally given the

15  greatest weight because the treating physician is employed to cure and has a

16  greater opportunity to understand and observe a claimant. *Smolen v. Chater*, 80

17  F.3d 1273, 1285 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th

18  Cir. 1989).

19       Nevertheless, the ALJ is not bound by the opinion of the treating physician.

20  *Smolen*, 80 F.3d at 1285. If a treating physician's opinion is uncontradicted, the

21  ALJ must provide clear and convincing reasons for giving it less weight. *Lester*,

22  81 F.3d at 830. If the treating physician's opinion is contradicted by other

23  opinions, the ALJ must provide specific and legitimate reasons supported by

24  substantial evidence for rejecting it. *Id.* at 830. Likewise, the ALJ must provide

25  specific and legitimate reasons supported by substantial evidence in rejecting the

26  contradicted opinions of examining physicians. *Id.* at 830-31. The opinion of a

27

28                                        6

non-examining physician, standing alone, cannot constitute substantial evidence. *Widmark v. Barnhart*, 454 F.3d 1063, 1067 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

### 1.    Dr. Rifat

Dr. Rifat, a family practitioner, treated plaintiff from November 1992 at least through February 2009.  AR at 223-32, 235-64, 295-386.  On December 6, 2007, Dr. Rifat treated plaintiff for sciatic pain on her left side, which she reported to have experienced for the preceding three months and for which ibuprofen was not working.  *Id.* at 262.  Dr. Rifat examined plaintiff and found abnormalities in her back.  *Id.* at 263.  Dr. Rifat then diagnosed sciatica and osteopenia and administered a trigger point injection.  *Id.* at 264.

On June 12, 2008, Dr. Rifat noted plaintiff's complaint of sciatic pain radiating down her left leg.  *Id.* at 247.  An MRI of the lumbar spine dated July 30, 2008 revealed mild scoliosis to the right in the mid-lower spine, and a minimal central disc protrusion at L4-5 with increased fluid in the facet joints, consistent with active synovitis.  *Id.* at 241-42.  On July 28, 2009, Dr. Rifat noted a positive anti-nuclear antibody blood test and recommended rheumatological workup.  *Id.* at 320, 322.

On May 31, 2010, Dr. Rifat wrote a narrative report detailing the course of plaintiff's illnesses, the prescribed treatment, and her response to treatment.  *Id.* at 296-98.  He indicated that plaintiff had suffered from low back and radicular pain from September 2007, and that he had referred plaintiff to Jeffrey Tan Ho, D.O., a specialist in physical medicine and rehabilitation, Zafar Khan, M.D., an orthopedic surgeon, Gharoon Panahi, M.D., a rheumatologist, and James Gitlin, M.D., also a rheumatologist.  *Id.*  After reviewing the four physicians' evaluations of plaintiff

7

1   as well as his own, Dr. Rifat determined that plaintiff has lumbar pain,

2   radiculopathic low back pain, sacroiliitis, lumbar facet joint synovitis, scleroderma

3   and/or mixed connective tissue disease, and fibromyalgia – which, together,

4   "result in having her experience wide-spread continuous, 24-hour pain, that is only

5   partially responsive to analgesic and other pharmacologic treatment modalities."

6   *Id.* at 298.  Dr. Rifat added that the pain experienced by plaintiff was "not

7   amenable to physical therapy, trigger point injections, or certainly any surgical

8   intervention."  *Id.*  Thus, Dr. Rifat concluded that plaintiff "should be considered

9   totally and permanently disabled," as she was "weak, lethargic and lacking

10  adequate mental sharpness to qualify for any employment or re-training."  *Id.*

11      In his decision, although the ALJ cited some of Dr. Rifat's findings, the ALJ

12  rejected Dr. Rifat's opinion concerning plaintiff's work capacity without

13  providing specific and legitimate reasons.  *See id.* at 24-26.  The ALJ did provide

14  two reasons.  First, the ALJ gave "great weight" to the April 2009 opinion of

15  Rocely Ella-Tamayo, M.D., a consultative examiner, that plaintiff "is capable of

16  work at the light exertional level with further limitation of occasional kneeling and

17  squatting" because this opinion "is supported by the evidence as a whole . . . ."  *Id.*

18  at 25, 272.  Second, the ALJ rejected Dr. Rifat's conclusion because "the

19  determination on whether an individual is 'disabled' or 'unable to work' under the

20  Social Security Act and Regulations is one that is reserved to the Commissioner

21  (Social Security Ruling 96-5p)."  *Id.* at 25.  The court, however, does not find

22  these reasons to be specific and legitimate.

23      As discussed above, the ALJ is not bound by a treating physician's opinion

24  and may opt to give greater weight to a consulting physician's opinion than to a

25  treating physician's opinion.  *See Smolen*, 80 F.3d at 1285.  And the ALJ was

26  correct to note that the determination of an individual's disability is "one that is

27

28                                              8

reserved to the Commissioner." AR at 25. But the ALJ failed to explain with specific and legitimate reasons why he rejected Dr. Rifat's opinion and preferred Dr. Ella-Tamayo's opinion, except to indicate generally that the consulting physician's opinion was "supported by the evidence as a whole." AR at 25. Specifically, the ALJ did not evaluate Dr. Rifat's diagnoses and determination that the combined effects of plaintiff's impairments "result in having her experience wide-spread continuous, 24-hour pain, that is only partially responsive to analgesic and other pharmacologic treatment modalities" – thus effectively rejecting Dr. Rifat's opinion without discussion. *See Smolen*, 80 F.3d at 1286 ("By disregarding [plaintiff's treating physicians'] opinions and making contrary findings, [the ALJ] effectively rejected them."). Indeed, the ALJ failed to address any of Dr. Rifat's findings, let alone provide a specific and legitimate reason for rejecting them. *See generally* AR at 23-26. Accordingly, the ALJ erred in rejecting Dr. Rifat's opinion. *See Lester*, 81 F.3d at 830 ("Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing.") (internal quotation marks and citation omitted).

### 2.   Dr. Gitlin

Dr. Gitlin is a rheumatologist who treated plaintiff from April 2010 to October 2010 and completed a "Multiple Impairment Questionnaire" on November 1, 2010. AR at 401-21, 423-30. After diagnosing plaintiff as suffering from sclerodactyly and finding that she was still experiencing pain throughout her body, especially in her joints and wrist, Dr. Gitlin prescribed Voltaren, an anti-inflammatory medication, and ordered x-rays of plaintiff's knees. *Id.* at 411, 417. X-rays of the knees were taken on October 1, 2010, and Naser Rahbar, M.D.,

1    provided Dr. Gitlin with a Radiology Report, which revealed "degenerative

2    changes in both knee joints, mainly involving the medial compartment,

3    represented by decreased joint space." *Id.* at 409-10.  On October 26, 2010,

4    Dr. Gitlin found plaintiff to be "still quite symptomatic," with pain in both knees,

5    low back, and right hip as well as fatigue. *Id.* at 408.  Dr. Gitlin found plaintiff

6    experienced only "partial relief of pain" from medication. *Id.*

7         In the Multiple Impairment Questionnaire, Dr. Gitlin affirmed the diagnoses

8    of bilateral degenerative arthritis of the knees, severe low back pain with

9    synovitis, an abnormal lupus test, and possible fibromyalgia. *Id.* at 423.  Clinical

10   findings in support of the diagnoses included patellar crepitus, diminished ranges

11   of motion with pain at the extremes of motion, and tender points in the soft tissues.

12   *Id.*  Dr. Gitlin found that plaintiff's primary symptoms consisted of persistent pain

13   in the knees, low back, and right hip, with numbness and tingling in the right foot;

14   fatigue; and depression. *Id.* at 424.  In his assessment of plaintiff's RFC, Dr.

15   Gitlin estimated that, in an eight-hour workday, plaintiff could: sit no more than

16   one hour and stand/walk no more that one hour with the need to get up and move

17   around for five to ten minutes every hour; lift up to 20 pounds occasionally and up

18   to five pounds frequently; carry up to ten pounds occasionally and five pounds

19   frequently. *Id.* at 425-26.  Dr. Gitlin also estimated that plaintiff has moderate

20   limitations in her ability to grasp, turn, twist objects, and perform fine and gross

21   manipulations and marked limitations in using arms for reaching. *Id.* at 426-27.

22   Dr. Gitlin then indicated that eight different medications had been prescribed for

23   plaintiff for her various conditions and that she had received epidural injections

24   for her back pain. *Id.* at 427.  In sum, Dr. Gitlin found that plaintiff's symptoms

25   frequently interfered with her attention and concentration, that she would be

26   incapable of tolerating even a "low stress" work environment, and that a patient

27

28                                         10

1  such as plaintiff, with "multiple chronic musculoskeletal pain symptoms as
2  described above[,] should be considered unable to work." *Id.* at 428-29.

3      In his decision, the ALJ gave Dr. Gitlin's opinion regarding plaintiff's RFC
4  "little weight" because plaintiff's own testimony "indicate[d] she is capable of a
5  greater range of physical activity on a daily basis" and "the level of limitations
6  described by Dr. Gitlin are not supported by the objective medical findings." *Id.*
7  at 25. Instead, as discussed above, the ALJ gave "great weight" to Dr. Ella-
8  Tamayo's opinion that plaintiff "is capable of work at the light exertional level
9  with further limitation of occasional kneeling and squatting" because this opinion
10 "is supported by the evidence as a whole . . . ." *Id.* The court, however, does not
11 find the ALJ's reasons to be specific and legitimate.

12     First, as discussed in Section IV.B below, the ALJ erred in finding that
13 plaintiff "indicate[d] she is capable of a greater range of physical activity on a
14 daily basis." *See id.* This finding does not accurately represent plaintiff's
15 statements about her daily activities. *See infra*. As such, the ALJ's construction
16 of plaintiff's statements regarding her range of physical activity cannot provide a
17 basis for discounting Dr. Gitlin's opinion.

18     Second, the ALJ did not provide any specific basis for his broad assertion
19 that "the level of limitations described by Dr. Gitlin are not supported by the
20 objective medical findings." *See* AR at 25. Just as with Dr. Rifat's findings, the
21 ALJ's opinion contains no evaluation of Dr. Gitlin's medical findings or opinion
22 on plaintiff's RFC, let alone specific and legitimate reasons as required. *See*
23 *generally id.* at 23-26. Defendant is correct that an ALJ may disregard a treating
24 physician's opinion and instead accept an examining physician's opinion if he
25 provides valid reasons for doing so. *See* Def.'s Mem. at 6. "This can be done by
26 setting out a detailed and thorough summary of the facts and conflicting clinical

27

28                                          11

1   evidence, stating [the ALJ's] interpretations thereof, and making findings." *Orn v.*

2   *Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (citation omitted).  But any such

3   detailed summary and analysis is conspicuously missing here.  Thus, once again,

4   this court is left to guess as to why the ALJ found the objective medical findings

5   do not support Dr. Gitlin's findings.  As such, the ALJ erred in rejecting Dr.

6   Gitlin's opinion.  *See Lester*, 81 F.3d at 830.

7         As the ALJ failed to provide specific and legitimate reasons for discounting

8   the opinions of Drs. Rifat and Gitlin, the ALJ erred in giving little weight to the

9   two treating physicians' opinions and instead according greater weight to the

10  opinion of a non-treating physician, Dr. Ella-Tamayo.

11  **B.    The ALJ Failed to Provide Clear and Convincing Reasons for**

12         **Discounting Plaintiff's Subjective Complaints**

13        Plaintiff argues that the ALJ failed to make a proper credibility

14  determination.  Pl.'s Mem. at 15-19.  Specifically, plaintiff contends that the

15  reasons provided by the ALJ for discounting plaintiff's subjective complaints "are

16  not fully credible," nor clear and convincing.  *Id.*  This court agrees.

17        An ALJ must make specific credibility findings, supported by the record.

18  Social Security Ruling ("SSR") 96-7p.[2]  To determine whether testimony

19  concerning symptoms is credible, an ALJ engages in a two-step analysis.

20  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36  (9th Cir. 2007).  First, an ALJ

21

22

23        [2]   "The Commissioner issues Social Security Rulings to clarify the Act's
implementing regulations and the agency's policies.  SSRs are binding on all
24  components of the [Social Security Administration].  SSRs do not have the force
of law.  However, because they represent the Commissioner's interpretation of the
25  agency's regulations, we give them some deference.  We will not defer to SSRs if
they are inconsistent with the statute or regulations."  *Holohan*, 246 F.3d at 1203
26  n.1 (internal citations omitted).

27

28                                            12

must determine whether a claimant produced objective medical evidence of an underlying impairment, "'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if there is no evidence of malingering, an "ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003).  An ALJ may consider several factors in weighing a claimant's credibility, including: (1) ordinary techniques of credibility evaluation such as a claimant's reputation for lying; (2) the failure to seek treatment or follow a prescribed course of treatment; and (3) a claimant's daily activities.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell*, 947 F.2d at 346-47.

In his decision, the ALJ found plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" (AR at 25), which "satisfie[s] the first [step] of the ALJ's inquiry regarding the credibility of [plaintiff]'s complaints." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). At the second step, because the ALJ did not find any evidence of malingering (*see generally* AR at 23-26), the ALJ was required to provide clear and convincing reasons for discounting plaintiff's credibility.  *See Benton*, 331 F.3d at 1040.

In his decision, the ALJ provided three reasons as to why he determined that "the record does not fully support the severity of [plaintiff's] allegations."  AR at 25.  First, the ALJ found that plaintiff had "reported functional abilities that lessen the credibility of her allegations," pointing to the fact that she can "prepare meals daily, dress herself, do laundry, shop in stores on a weekly basis, and do light house cleaning and yard work." *Id.* at 25, 183-85.  Second, the ALJ found plaintiff had received conservative treatment only, "consisting of a few injections,

prescribed pain medication, and therapeutic exercises," but without any surgery recommendations.  *Id.* at 25.  Third, the ALJ found that plaintiff had not "followed through with all recommended treatment."  *Id.*  The court finds the ALJ's reasons were not clear and convincing reasons supported by substantial evidence.

First, the ALJ noted that plaintiff's own reported activities of daily living "lessen the credibility of her allegations" of limitations.  *Id.*  The ALJ may properly consider inconsistencies between plaintiff's pain allegations and daily activities.  *See Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  But the ALJ's finding that plaintiff's daily activities lessen her credibility misstates the record and is not supported by substantial evidence.  *See Lingenfelter*, 504 F.3d at 1036 (reasons for discrediting plaintiff that mischaracterize the record "provide[] no support for the [ALJ's] credibility finding[]").

The ALJ noted from plaintiff's Exertion Questionnaire completed on March 3, 2009 that she could "prepare meals daily, dress herself, do laundry, shop in stores on a weekly basis, and do light house cleaning and yard work."  AR at 25, 183-85.  Yet, the ALJ failed to note plaintiff's additional explanatory remarks included in the Exertion Questionnaire or to address the responses she gave at the December 15, 2010 hearing.  *See id.* at 25, 41-46, 183-85.  With regard to meal preparation, plaintiff indicated in the Questionnaire that she "love[s] to cook" but that "sometimes it is very difficult to stand to prepare a meal for dinner" and that she has to "start early and sit down often."  *Id.* at 183.  Plaintiff further stated at the hearing that "just standing in the kitchen and preparing food for half an hour . . . really gets [her] back and [her] hips sometimes."  *Id.* at 42-43.  As for dressing herself, plaintiff indicated that it is "sometimes painful" (*id.* at 183) and that "[g]etting up is probably one of the hardest times of the day, because that's when [she has] the most pain" (*id.* at 42).  Regarding laundry and house cleaning,

14

1   plaintiff indicated she has a weekly housekeeping service to do the major chores
2   and her mother "does most of the laundry and dishes," though plaintiff does help
3   with light chores, such as "straightening up." *Id.* at 184. She stated that "even just
4   making beds sometimes [or] . . . just lifting the end of the mattress [is] hard." *Id.*
5   at 42. As for shopping, she stated she takes "short trips" and with her mother
6   usually. *Id.* at 43, 184. Finally, regarding yardwork, plaintiff stated that she does
7   "light yardwork," which she described as trimming roses and watering and feeding
8   her plants. *Id.* at 184. She added that she does not do yardwork "for very long"
9   and "sit[s] frequently" when she does it. *Id.*

10          As plaintiff asserts in her briefing, the ALJ's failure to account for these
11   explanatory details and descriptions of pain in plaintiff's testimonies resulted in
12   distortion of plaintiff's statements about her daily activities and her pain and
13   limitations. Pl.'s Mem. at 17; *see Benecke v. Barnhart*, 379 F.3d 587, 594 (9th
14   Cir. 2004) (ALJ erred in discrediting plaintiff's pain testimony based on daily
15   activities that were "quite limited and carried out with difficulty[]"). Although the
16   ALJ took note, in an earlier portion of his opinion, of plaintiff's testimony at the
17   hearing that sitting for more than fifteen minutes is difficult for her and requires
18   her to stand for at least five minutes before being able to sit again and that she
19   cannot stand for more than thirty minutes due to pain on her back and hips (AR at
20   24), the ALJ did not address these statements, which were given in the context of
21   plaintiff's descriptions of daily activities, in assessing her capacity for the
22   activities. Nor did the ALJ take into account plaintiff's statement that "for the
23   most part, every day, at some point, I am hurting too bad to do much of anything,
24   but just sit and take some more pills and wait for them to work." *See id.* at 43.
25   Moreover, plaintiff's testimony at the hearing that she slept at most only four to
26   five hours per night due to pain is missing from the ALJ's analysis. *See id.* at 46.
27
28                                           15

1       In any event, plaintiff's reported daily activities are not inconsistent with

2 her claim of disabling impairments. *See Orn*, 495 F.3d at 639 (the mere fact that

3 plaintiff has carried on certain daily activities is not a clear and convincing reason

4 for discrediting his testimony); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)

5 ("[M]any home activities are not easily transferable to what may be the more

6 grueling environment of the workplace, where it might be impossible to

7 periodically rest or take medication."); *see also Vertigan v. Halter*, 260 F.3d 1044,

8 1049-50 (9th Cir. 2001) (plaintiff's ability to go grocery shopping with assistance,

9 walk approximately an hour in the mall, get together with friends, play cards,

10 swim, watch television, read, take physical therapy, and exercise at home did not

11 constitute a clear and convincing reason for rejecting her pain testimony).  Here,

12 "there is neither evidence to support that [plaintiff]'s activities were 'transferable'

13 to a work setting nor proof that [plaintiff] spent a 'substantial' part of [her] day

14 engaged in transferable skills."  *Orn*, 495 F.3d at 639; *see* AR at 25-26.

15 Accordingly, the ALJ erred to the extent he rejected plaintiff's testimony based on

16 her daily activities.  *See Orn*, 495 F.3d at 639 ("The ALJ must make 'specific

17 findings relating to [the daily] activities' and their transferability to conclude that a

18 claimant's daily activities warrant an adverse credibility determination.").

19       Second, the ALJ noted plaintiff has received conservative treatment.  AR at

20 25; *see Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of

21 'conservative treatment' is sufficient to discount a claimant's testimony regarding

22 severity of an impairment.").  The ALJ explained that plaintiff's treatment

23 consisted only of "a few injections, prescribed pain medication, and therapeutic

24 exercises," but without any surgery recommendations.  AR at 25.  This was not a

25 clear and convincing reason.

26

27

28                              16

The ALJ correctly determined that plaintiff largely received conservative treatment, but he failed to acknowledge the serious nature of some of the treatment plaintiff received. While the ALJ properly concluded that pain medication and therapeutic exercises that plaintiff received were conservative treatment measures, epidural and trigger point injections may not be considered conservative. *See Tommasetti*, 533 F.3d at 1040 (describing anti-inflammatory medication as conservative treatment); *Christie v. Astrue*, No. 10-3448, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize steroid and trigger point injections as conservative). As the ALJ himself observed, plaintiff received various injections over the course of her treatment, including a trigger point injection for sciatica, caudal injections, a lumbar epidural injection, and hyaluronidase injections to her left knee. AR at 24, 288, 291, 296-97, 372, 388, 393, 395. Thus, it was improper for the ALJ to characterize the treatment recommendations plaintiff received as only "conservative." *Id.* at 25.

Moreover, the ALJ's observation that "[n]o doctor has recommended surgery for [plaintiff's] knees or back condition" miscasts the record. As Dr. Rifat reported, Zafar Kahn, M.D., a spine orthopedic surgeon who examined plaintiff, concluded that "there is no surgical solution that would alleviate [plaintiff's] symptoms" in her lower back. *Id.* at 297. Similarly, Dr. Panahi and Dr. Gitlin, who examined plaintiff for her knee condition, offered "no further treatment recommendation" than what she was already getting. Furthermore, with regard to plaintiff's fibromyalgia, Dr. Rifat reported that the "wide-spread continuous, 24-hour pain" was "only partially responsive to analgesic and other pharmacological treatment modalities," but was nonetheless "not amenable to physical therapy, trigger point injections, or certainly any surgical intervention." *Id.* at 298. As surgical solutions to plaintiff's problems of pain were considered unavailable by

17

1  physicians who treated and examined plaintiff, it was improper for the ALJ to cite

2  lack of surgery recommendation as a reason for discounting plaintiff's credibility.

3  Accordingly, the ALJ erred to the extent he rejected plaintiff's testimony based on

4  conservative treatment and lack of surgery recommendation.

5       Third, the ALJ found that plaintiff had not "followed through with all

6  recommended treatment." *Id.* at 25.  Although the ALJ did not identify the alleged

7  noncompliance, he noted elsewhere in the opinion that Dr. Ho and Dr. Kahn

8  recommended facet joint injection in April and May 2009, but plaintiff did not

9  return for further treatment with either physician and "[t]here is no evidence

10  [plaintiff] followed through with the recommendations for facet injection." *Id.* at

11  24, 284, 388, 391.  Medical records produced by Dr. Kahn includes a note

12  indicating that plaintiff did return to the physician in July for back pain treatment,

13  at which time plaintiff received another recommendation for facet joint injection.

14  *Id.* at 284.  Another note produced by Dr. Kahn shows that Dr. Ho gave plaintiff

15  caudal injections in April 2009 and June 2009 and an epidural procedure in

16  August 2009.  *Id.* at 291.  The note, lacking detailed descriptions, does not explain

17  why caudal and epidural injections, instead of facet joint injections, were

18  administered.  *See id.*  But given that plaintiff sought treatment from Dr. Ho for

19  her back pain, it is clear that the caudal and epidural injections were administered

20  to alleviate plaintiff's back pain.  Thus, to the extent that the ALJ found plaintiff

21  to have been noncompliant regarding injection recommendations by Drs. Ho and

22  Kahn, the ALJ appears to have erred in fact.  The record shows plaintiff did follow

23  the two physicians' recommendations and received further treatment with the two

24  physicians.  Accordingly, the ALJ erred to the extent he discounted plaintiff's

25  subjective complaints based on noncompliance.

26

27

28                                      18

1      In sum, the ALJ did not provide clear and convincing reasons supported by

2  substantial evidence for discounting plaintiff's credibility.

3  **C.**    **The ALJ Failed to Show the Alternate Jobs Cited Require Little to No**

4        **Vocational Adjustment in Light of Plaintiff's Advanced Age**

5      Plaintiff asserts that the ALJ failed to make a proper finding on vocational

6  adjustment.  Pl.'s Mem. at 19-21.  Specifically, plaintiff argues because she, as a

7  sixty-two-year-old, was closely approaching retirement age as of her last insured

8  date, the ALJ was required to make a specific finding that very little to no

9  vocational adjustment would be required for plaintiff's skills to transfer from her

10  past relevant work as emergency room nurse to the school nurse or office nurse

11  positions identified by the ALJ.  *Id.* at 20-21.  Plaintiff contends the ALJ erred in

12  failing to make this required finding of very little to no vocational adjustment.  *Id.*

13  This court agrees.

14      When determining whether or not individuals aged fifty-five and over have

15  transferable skills to alternative jobs, the ALJ must consider the degree of

16  vocational adjustment involved in utilizing acquired skills in a new job.  "For a

17  finding of transferability of skills to light work for individuals of advanced age

18  who are closely approaching retirement age (age 60-64), there must be very little,

19  if any, vocational adjustment required in terms of tools, work processes, work

20  settings, or the industry."  20 C.F.R. § 404, Subpart P, App. 2, § 202.00(f).  Such

21  individuals

22        cannot be expected to make a vocational adjustment to substantial

23        changes in work simply because skilled or semi-skilled jobs can be

24        identified which have some degree of skill similarity with their past

25        relevant work.  In order to establish transferability of skills for such

26        individuals, the semiskilled or skilled jobs duties of their past work

27

28                        19

1     must be so closely related to other jobs which they can perform that

2     they could be expected to perform these other identified jobs at a high

3     degree of proficiency with a minimal amount of job orientation.

4   SSR 82-41; *see also Renner v. Heckler*, 786 F.2d 1421, 1424 (9th Cir. 1986) (in

5   cases involving advanced age individuals, the ALJ must make a specific finding as

6   to the amount of vocational adjustment required).  Requiring the ALJ to

7   demonstrate that claimants of advanced age would be able to perform alternative

8   jobs with "very little, if any, vocational adjustment . . . is necessary to assure that

9   the correct legal standard was applied.  Thus the ALJ must either make a finding

10  of 'very little vocational adjustment' or otherwise acknowledge that a more

11  stringent test is being applied which takes into consideration appellant's age."

12  *Renner*, 786 F.2d at 1424; *see also Greenwood v. Chater*, 1996 WL 945021, at *8

13  (C.D. Cal. 1996) (finding that the ALJ erred by failing to make specific findings

14  with respect to vocational adjustment necessary for transfer of skills held by an

15  advanced age plaintiff).

16        Here, the ALJ's opinion appears to indicate that no vocational adjustment

17  would be required for plaintiff – who was fifty-seven years old as of the onset of

18  her disability, sixty at the time of her hearing, and sixty-two as of her last insured

19  date (thereby classifying her in the "advanced age closely approaching retirement"

20  category ) – for transfer from her past relevant work as an emergency nurse to a

21  school nurse or office nurse position.  *See* AR at 26-27.  The ALJ stated that at the

22  hearing the VE "was asked if any occupations exist which could be performed by

23  an individual with the same age, education, past relevant work experience, and

24  residual functional capacity as the claimant, and which require skills acquired in

25  the claimant's past relevant work but no additional skills."  *Id.* at 26.  The ALJ

26  then stated that the VE identified school nurse and office nurse as occupations that

27

28                                      20

1  such individuals could perform.  *Id.* at 26-27.  This description of the VE's
2  testimony appears to show that no vocational adjustment would be necessary for
3  plaintiff in taking up work as a school nurse or an office nurse.

4      But the ALJ did not accurately describe the VE's hearing testimony.  The
5  ALJ asked the VE merely whether there are transferable skills from plaintiff's past
6  relevant work to which the VE responded: "I believe there would be transferable
7  skills."  *Id.* at 47.  Without explaining more, but assuming "lighter nursing work,"
8  the VE listed school nurse and office nurse as jobs for which plaintiff would have
9  transferable skills.  *Id.*  When asked by plaintiff's attorney what skills would
10 transfer to the school nurse and office nurse positions, the VE responded that "just
11 very basic nursing skills" would transfer by virtue of having a registered nurse
12 license.  *Id.* at 49.  The VE also "assume[d] that there are some continuing
13 education requirements for nurses" that one would need to fulfill to work as a
14 school nurse or an office nurse, but the VE indicated he did not know what they
15 were.  *Id.* at 49-50.  Thus, although the VE did state that "[t]he work of an ER
16 nurse . . . would be significantly more complicated than . . . a school nurse and
17 office nurse," at no point did the VE indicate that "no additional skills" would be
18 necessary for the alternative jobs.  *Id.* at 26, 49.

19     Indeed, the VE's testimony is vague as to the degree of transferable skills
20 required and cannot be interpreted as having made a specific showing that very
21 little to no vocational adjustment would be required for plaintiff, as required by
22 *Renner*.  *See Renner*, 786 F.2d at 1424.  Nor does the ALJ's opinion, relying
23 exclusively on but mischaracterizing the VE's testimony, demonstrate that
24 plaintiff would be able to perform work as a school nurse or an office nurse with
25 very little to no vocational adjustment, or that a more stringent test was being
26 applied to the issue of transferability taking into consideration plaintiff's age.  *See*
27
28                                         21

1   *id.*  Accordingly, the ALJ failed to show the alternate jobs cited require little to no

2   vocational adjustment in light of plaintiff's advanced age, as required by 20 C.F.R.

3   § 404, Subpart P, App. 2, § 202.00(f).

4   ### V.

5   ### <u>REMAND IS APPROPRIATE</u>

6        The decision whether to remand for further proceedings or reverse and

7   award benefits is within the discretion of the district court.  *McAllister v. Sullivan*,

8   888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by

9   further proceedings, or where the record has been fully developed, it is appropriate

10  to exercise this discretion to direct an immediate award of benefits.  *See Benecke*,

11  379 F.3d at 595-96; *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000)

12  (decision whether to remand for further proceedings turns upon their likely

13  utility).  But where there are outstanding issues that must be resolved before a

14  determination can be made, and it is not clear from the record that the ALJ would

15  be required to find a plaintiff disabled if all the evidence were properly evaluated,

16  remand is appropriate.  *See Benecke*, 379 F.3d at 595-96; *Harman*, 211 F.3d at

17  1179-80.

18       Here, as set out above, remand is required because the ALJ erred in failing

19  to properly evaluate the opinions of Drs. Rifat and Gitlin, in discounting plaintiff's

20  credibility, and in assessing plaintiff's vocational adjustment in light of her

21  advanced age.  On remand, the ALJ shall: (1) reconsider the opinions provided by

22  Drs. Rifat and Gitlin, and either credit their opinions or provide adequate reasons

23  under the appropriate legal standard for rejecting any portion of their opinions;

24  and (2) reconsider plaintiff's subjective complaints, and either credit plaintiff's

25  testimony or provide clear and convincing reasons supported by substantial

26  evidence for rejecting it.  The ALJ shall then assess plaintiff's RFC and proceed

27

28                                              22

through steps four and five to determine what work, if any, plaintiff is capable of performing.  In addition, at step five, the ALJ shall reconsider the VE's testimony (or carefully consider any new VE testimony) and either find that no alternative jobs requiring very little to no vocational adjustment exist for plaintiff or demonstrate that plaintiff can work the alternative jobs identified by the VE with very little or no vocational adjustment.

## VI.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter to the Commissioner for further administrative action consistent with this decision.

DATED: July 25, 2013

_____
SHERI PYM
United States Magistrate Judge

23